UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS C. HEBRANK, Federal Equity Receiver,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>LINMAR III, LLC, a California limited liability corporation; and Does 1-25,<br><br>　　　　　　　　　　Defendants. | Case No.: 13-cv-02180-GPC-JMA<br><br>ORDER APPROVING RECEIVER'S FINAL ACCOUNT AND REPORT, EXONERATING RECEIVER'S BOND; APPROVING DISTRIBUTION OF FUNDS HELD BY POST-JUDGMENT RECEIVER; EXONERATING POST-JUDGMENT RECEIVER'S BOND; AND DISCHARGING POST-JUDGMENT RECEIVER.<br><br>[ECF No. 80] |

Before the Court is the Thomas C. Hebrank's ("Hebrank" or "Receiver") motion to approve the post-judgment receiver's final account and report; approve distribution of

1

funds held by post-judgment receiver; exonerate post-judgment receiver's bond; and discharge post-judgment receiver. ECF No. 80. Counsel for LinMar III, Philip Dyson ("Dyson"), filed an opposition on July 18, 2019. ECF No. 82. A reply was filed on July 26, 2019. ECF No. 83.

## BACKGROUND

The Court-appointed James S. Lowe ("Lowe") as post-judgment receiver on June 3, 2015. ECF No. 48. Lowe completed the sale of the LinMar III property on December 31, 2018 and filed his Final Account and Report on March 5, 2019. ECF No. 74. The instant dispute between the Receiver and Dyson centers on the distribution of the $43,450 in funds remaining in the post-judgment receivership account.

This case arises out of a Securities Exchange Commission ("SEC") action, *SEC v. Schooler et al.*, Case No. 3:12-cv-2164-GPC-JMA (S.D. Cal.), wherein the Court authorized the Receiver to pursue enforcement of promissory notes executed by LinMar III, LLC ("LinMar"). LinMar, while under the control of Louis Schooler, granted a second deed of trust on the property owned by LinMar ("LinMar Property") to Dyson in order to secure attorney fees. ECF 80-1 at 7; Declaration of Thomas Hebrank ("Hebrank Decl.") ¶ 3. The property had a mortgage on it in favor of Rabobank, and a third deed of trust in favor of the SEC. Hebrank Decl. ¶ 2.

Lowe encountered significant challenges with the LinMar Property, including issues with property renovations and maintenance. Declaration of James Lowe ("Lowe Decl.") ¶ 2. On August 12, 2018, Dyson emailed Lowe, asking him to lower the listing

2

13-cv-02180-GPC-JMA

price of the property from $3.9 million to $3.5 million in order to be realistic given the state of the real estate market. ECF No. 82 at 1-2; Dyson Ex. 1.

Lowe pursued various initial offers on the property, and the highest offer received was for $3,550,000. ECF 80-1 at 8. If the property had been purchased at $3,550,000, there would have been enough funds to pay Rabobank, Dyson, and the Receiver in full, with a significant amount left to make a partial payment to the SEC. ECF No. 80-1 at 8. However, these initial offers fell through after the prospective purchasers conducted further review of the property. *Id.*; Lowe Decl. ¶ 3.

On December 7, 2018, an offer was made to purchase the property for $3.2 million ("December Offer"). ECF No. 82 at 3. Since the Rabobank mortgage note had matured, and the prospect of foreclosure was looming, Dyson and Hebrank decided to accept this December Offer even though $3.2 million would be insufficient to pay all parties in full. Lowe Decl. ¶ 3. Dyson and Receiver agreed to accept discounted payments, and the SEC agreed to release its lien with no payment. Lowe Decl. ¶ 4. Specifically, Dyson agreed to accept $200,000 (original amount was $285,000) and Receiver agreed to accept $120,000 (originally amount was $176,000). ECF No. 80 at 8; ECF No. 82 at 6-7.

On December 17, 2018, Lowe emailed Dyson confirming that Dyson and Hebrank would accept discounts at thirty and thirty-two percent, respectively. Dyson Decl., Ex 5. In this same email, Lowe wrote, "My plan is that the final distribution of the Receivership funds (after bills are paid and court approval) will be equally distributed by percentage of total remaining owed to each of you." Dyson Decl. Ex. 5. Dyson claims that he relied on Lowe's December 17 email in agreeing to discount his trust deed.

3

13-cv-02180-GPC-JMA

Dyson Decl. ¶ 15. However, on December 19, 2018, Lowe sent another email to Dyson and the SEC which contained escrow payoff demands for Dyson and the SEC; Rabobank's demand for their first trust deed payoff; and, in relevant part, an Estimated Closing Cash Flow ("ECCF"). Dyson Decl. Ex. 7. The ECCF includes a breakdown of the property purchase offer (*i.e.*, $3.2 million) and the distributions to be allotted, noting $200,000 will go to to Dyson (with the adjacent note, "Discounted demand to escrow - 30%) and $120,000 to Hebrank (with the adjacent note, "Discounted demand to escrow"). *Id.* Below this breakdown of fund distribution is a section titled "Total Owed" listing amounts for Dyson as $285,000 and for Hebrank, $176,000. *Id.*

In most relevant part, the ECCF includes a paragraph stating that "[a]ny funds remaining within the Receivership after the payment of obligations, will be sent to the SEC in payment of their demand of remaining funds." *Id.* The ECCF does not state any limits or conditions about the amount that should go to the SEC.

Later that same day when Lowe sent the ECCF to Dyson, Dyson released his lien, and the $200,000 was sent to Dyson. Lowe Decl., Ex. B. The sale of the LinMar Property officially closed on December 31, 2018. Hebrank alleges that Dyson verbally communicated his assent to the terms of the ECCF to Lowe, and then confirmed his agreement by signing the release of his lien and delivering it to escrow in exchange for the $200,000 payment from escrow at the sale closing. ECF 80-1 at 12.

On or around January 19, 2019, Lowe contacted the Receiver's staff to inform them that approximately $43,450 remained in the post-judgment receivership account. ECF 80-1 at 9. These funds came primarily from the broker accepting a reduced

4

commission on the sale, the buyer agreeing to split the escrow fees and provide a credit for certain remodeling work, as well as an insurance rebate. ECF 80-1 at 9; Lowe Decl., ¶ 5. Receiver's counsel contacted the SEC to notify them about the remaining funds, and counsel for SEC obtained approval for these funds to be distributed to the victims of the fraudulent scheme in the related SEC action. *Id.* A stipulation to that effect was sent to Dyson via email for his approval/review on June 5, 2019. *Id.* On June 13, 2019, Dyson replied claiming his reliance on Lowe's December 17, 2018 email, and his belief that the $43,450 of remaining funds should be split between the SEC and himself on a pro-rata basis based on the original amounts owed to each party (i.e., $285,000 to Dyson and $176,000 to the SEC). Hebrank Decl. Ex. B.

**DISCUSSION**

Dyson opposes the Receiver's motion on the basis that he is owed a percentage of the remaining $43,450 in the post-judgment receivership account. Specifically, Dyson seeks sixty percent of the remaining funds (*i.e.*, $26,191.66) with the remaining amount (i.e., $17,258.34) to go to the SEC as third deed holder. Although Dyson cites no legal authority, he asserts that he did not agree to discount his second trust lien "as a gift to the SEC." ECF 82 at 7.

**I. Consent**

Under California law, mutual assent is a required element of contract formation. "Mutual assent may be manifested by written or spoken words, or by conduct, and acceptance of contract terms may be implied through action or inaction." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Binder v. Aetna Life Ins.*

5

*Co.,* 75 Cal.App.4th 832, 850 (1999); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 593–95, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)). Courts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement. *Meyer v. Benko,* 55 Cal.App.3d 937, 942–43 (1976).

Dyson relies heavily on Lowe's representations in the December 17, 2018 email. However, any representations by Lowe's December 17, 2018 email, were supplanted by the ECCF that circulated on December 19, 2018. Further, in his December 17, 2018 email, Lowe did not indicate that this was the final plan for the distribution of funds, and there was no reason for Dyson to believe that Lowe's representation of "his plan" in the December 17 email would override the provisions listed in the ECCF circulated two days later.

Dyson does not dispute his receipt of the ECCF or his awareness of the existence of the ECCF provision indicating that all remaining funds would go to the SEC since he admits that he did receive an email on December 19, 2018, from Lowe with the ECCF document. ECF 82 at 5; Dyson Decl. Ex, 7. *Cf. Windsor Mills, Inc.,* 25 Cal.App.3d at 993 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.").

Dyson's acceptance of the terms of the ECCF is further reinforced by his decision to release his lien that same day in order to receive the $200,000 payout. Accordingly, the Court finds that Dyson assented to the terms of the ECCF that was circulated to the parties on December 19, 2018.

6

13-cv-02180-GPC-JMA

## II. Unconscionability

Dyson does not make a legal argument with respect to the substantive nature of the ECCF, but claims that he agreed to accept the discounted amount based on his concerns that he might receive nothing from his trust deed since Rabobank was threatening foreclosure proceedings, and also based on his concern that Lowe was favoring the SEC over all other parties. Dyson Decl. ¶ 13. Dyson also alleges that he believed that the remaining funds in the post-judgment account would total around $2,000. Dyson Decl. ¶13. The Court interprets these allegations as a claim seeking to invalidate the terms of the ECCF as an unconscionable contract.

In California, courts may refuse to enforce a contract if it is unconscionable. Cal. Civ.Code § 1670.5 (1999). "Courts have held that the agreement must be 'overly harsh,' 'unduly oppressive,' 'unreasonably favorable,' or must 'shock the conscience.'" *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017) (quoting *Sanchez*, 61 Cal.4th at 911 (emphasis omitted)). The "central idea" is that "the unconscionability doctrine is concerned not with a simple old-fashioned bad bargain but with terms that are unreasonably favorable to the more powerful party." *Baltazar*, 62 Cal.4th at 1244 (internal quotation marks and citations omitted). "Not all one-sided contract provisions are unconscionable," *Sanchez*, 61 Cal.4th at 911, 190 Cal.Rptr.3d 812, and "[t]he ultimate issue is whether, in view of all relevant circumstances, the contract is so unfair that enforcement must be withheld." *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037–38 (N.D. Cal. 2019). The "mere fact that a contract term is not read or understood by the non-drafting party or that the drafting party occupies a superior bargaining

7

position will not authorize a court to refuse to enforce the contract." *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (Ct. App. 1982).

Here, Dyson is a sophisticated actor who has represented LinMar III for over six years. As such, Dyson is well acquainted with the nature of LinMar Property and the issues in this case. His position does not support a finding of unequal bargaining power to render the terms of the ECCF unconscionable. Dyson asserts that he felt pressure to accept the thirty percent discount based on Rabobank's imminent initiation of foreclosure proceedings, and Lowe's potential bias for the SEC. Dyson Decl. ¶ 13. However, any pressure that Dyson felt for a timely sale of the LinMar Property was not based on any falsehood or manipulation, since it was true that any profit he might have made off the property sale would have been jeopardized by Rabobank's potential foreclosure.

Accordingly, the Court orders the following:
1. The Receiver's Final Account and Report is hereby approved;
2. Receiver is ordered to pay all remaining funds to Thomas Hebrank, as receiver in the related SEC Action, from the Receivership Estate, thereby closing any existing banking account within 30 days from the signing of this Order;
3. The Receiver's fees and expenses and those of his agents and professionals, as set forth in the Final Account and Report are hereby approved;
4. The Receiver's and his professional's actions and transactions during his administration of the Receivership Estate are approved;
5. The Receivership is terminated;

6. The Receiver's bond is exonerated;

7. Notice of the Receiver's Final Account and Report was adequate;

8. This Court will retain jurisdiction regarding the Receiver's actions, transactions and his Final Account and Report; and

9. James S. Lowe II shall be and hereby is discharged from any and all further duties, liabilities, or obligations related to this action.

Dated: October 25, 2019

                                             Hon. Gonzalo P. Curiel
                                             United States District Judge